UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No.
08-10094-WGY

UNITED STATES OF AMERICA

v.

CARMEN S. DINUNZIO

## MEMORANDUM AND ORDER ON
## GOVERNMENT'S MOTION FOR DETENTION

May 20, 2008

DEIN, M.J.

### I.  MOTION RELATING TO DETENTION

The defendant is charged in a one-count indictment with conspiracy to commit

bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 371.

An initial appearance was held on May 2, 2008 before Magistrate Judge Alexander, at

which time the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(B)

on the grounds that there is "a serious risk" that the defendant "will obstruct or attempt

to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or

intimidate, a prospective witness or juror" and there are no conditions or combination of

conditions which will reasonably assure the safety of any other person and the

community.  The defendant was represented by counsel at the initial appearance.

A detention hearing was held on May 7, 2008, at which time the defendant was

represented by counsel.  The government presented the testimony of Special Agent

Michael Kelly of the FBI and introduced various exhibits.  The defendant cross-examined Agent Kelly and introduced exhibits, but did not present any witnesses.  The hearing was continued to May 13, 2007 by agreement, at which time the court accepted additional exhibits from the parties and heard arguments from counsel.

After a careful review of the evidence presented, and consideration of the arguments of counsel, this court finds that the government has not met its burden of proving by clear and convincing evidence either that there is a serious risk that the defendant will obstruct or attempt to obstruct justice as defined by § 3142(f)(2)(B) or that there are no conditions which can be set which will reasonably assure the safety of witnesses or the community.  See United States v. Ploof, 851 F.2d 7, 12 (1st Cir. 1988) (to warrant detention, court must find that "there is a serious risk defendant will engage or attempt to engage in the conduct set forth in § 3142(f)(2)(B) and that no condition or combination of conditions set forth in § 3142(c) will reasonably assure the safety of any other person and the community").  In addition, this court finds that the government has not met its burden of proving by a preponderance of the evidence that the defendant poses a serious risk of flight.  Therefore, the defendant shall be ordered released subject to the conditions set forth below.

## II.  THE BAIL REFORM ACT

A.      Under the provisions of 18 U.S.C. § 3142 ("The Bail Reform Act"), the judicial officer shall order that, pending trial, the defendant either be (1) released on his or her own recognizance or upon execution of an unsecured bond; (2) released on a

condition or combination of conditions; (3) temporarily detained to permit revocation of

conditional release, deportation or exclusion; or (4) detained.  See 18 U.S.C. § 3142(a).

Under § 3142(e), a defendant may be ordered detained pending trial if the

judicial officer finds by clear and convincing evidence after a detention hearing "that no

condition or combination of conditions (set forth under § 3142(b) or (c)) will reasonably

assure the safety of any other person or the community . . . ," or if the judicial officer

finds by a preponderance of the evidence after a detention hearing "that no condition or

combination of conditions will reasonably assure the appearance of the person as

required . . . ."  See United States v. Patriarca, 948 F.2d 789, 792-93 (1st Cir. 1991).

B.     The government is entitled to move for detention on grounds of danger to

the community in certain specific situations.  In the instant case, the government

contends that there is "a serious risk that [the defendant] will obstruct or attempt to

obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure or

intimidate, a prospective witness or juror."  18 U.S.C. § 3142(f)(2)(B).

C.     In determining whether there are conditions of release which will

reasonably assure the appearance of the person as required and the safety of any

other person and the community, or whether pretrial detention is warranted, the judicial

officer must take into account and weigh information concerning --

      (1)     the nature and circumstances of the offense charged,
including whether the offense is a crime of violence, a federal crime of
terrorism, or involves a minor victim or a controlled substance, firearm,
explosive or destructive device;

      (2)     the weight of the evidence against the accused;

(3)     the history and characteristics of the person, including --

(a)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(b)     whether, at the time of the current offense or arrest, the defendant was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state or local law; and

(4)     the nature and seriousness of the danger to any other person or the community that would be posed by the person's release.

See 18 U.S.C. § 3142(g).

D.     Additionally, in making the determination, the judicial officer must consider two rebuttable presumptions where applicable.  See 18 U.S.C. § 3142(e). However, in the instant case the government does not contend that any presumption applies to the detention analysis.

### III.  DISCUSSION OF WHETHER DETENTION IS WARRANTED

"Detention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant." U.S. v. Tortora, 922 F.2d 880, 888 (1st Cir. 1990), and cases cited.  In the instant case, this court finds that the government has failed to meet its burden of proving that detention is appropriate.

### A.  The Offense Charged And Weight Of The Evidence

The defendant is charged with conspiracy to commit bribery, and the evidence against him appears strong.  Most of the meetings and conversations upon which the

charges are based apparently were the subject of audio and/or video recordings.  This

court notes, however, that the crime as charged does not involve violence or threats of

violence.

Briefly, the evidence before this court is that in or about May 2006, a

cooperating witness ("CW-1") informed the FBI that defendant DiNunzio had contacted

him and told CW-1 that he would be contacted by a third person about selling stolen

loam to the Big Dig.  CW-1 is someone well-known to DiNunzio, and DiNunzio knows

his identity.  CW-1 works in the construction industry.  After this phone call from

DiNunzio, CW-1 was, in fact, contacted by co-defendant Anthony D'Amore.  The idea of

selling stolen loam fell to the wayside.  However, according to the government, the

scheme to bribe a highway department employee to obtain the loam contract, and then

to deliver less than the contracted for amount of loam continued to be planned.  Apart

from a $15,000 down payment to the alleged highway department employee, the

scheme was never consummated.  As the government described the scheme in Agent

Kelly's affidavit:

> In summary, during these various recorded meetings DiNunzio,
> D'Amore and CW-1 discussed a deal in which they would bribe a
> Massachusetts Highway inspector, introduced to them by CW-1 as
> "Mike", to ensure that they received the contract to supply the Big
> Dig with 300,000 cubic yards of loam that would be supplied by
> D'Amore's contact, Andrew Marino.  The individual the parties
> knew as "Mike" was, in fact, an undercover law enforcement officer
> (hereinafter the "UC" or Mike").  The proposed loam contract would
> be worth $6,000,000 (i.e., the Big Dig would pay $20 per yard of
> loam, including trucking and delivery costs to be billed by a
> company with which Marino was associated, "Company A", that
> would supply the loam).

During consensually recorded conversations throughout the summer and fall of 2006, DiNunzio, D'Amore, and Marino agreed to pay "Mike", who they believed was a Massachusetts Highway inspector, a cash down payment and 5% of the revenue from the contract in exchange for "Mike"'s assurance that they would get the contract to sell 300,000 yards of loam to the Big Dig.

During a consensually recorded meeting on September 22, 2006, DiNunzio provided $10,000 in cash to CW-1 for the purpose of facilitating the down payment of the payoff to "Mike".   On September 29, 2006, Marino, D'Amore, and CW-1 met with "Mike" (i.e., the UC) at Company A and provided "Mike" with the $10,000 in cash supplied by DiNunzio, as well as an additional $5,000 in official government funds ostensibly supplied by CW-1, as a down payment for "Mike"'s assistance in ensuring that they secure the contract to sell the Massachusetts Highway Department 300,000 yards of loam.  This meeting was consensually recorded on audio and video tape.  During the same recorded meeting on September 29, 2006, Marino provided "Mike" with a sample of the 300,000 yards of loam that they proposed to sell to the Massachusetts Highway Department.

Ex. 1 (Kelly Aff.) at ¶¶ 5-7.  Thus, according to the government, defendant D'Amore reported to DiNunzio, and brought defendant Marino into the deal.  For his part, Marino was to supply the loam from Company A and transport it through his trucking company ("Company B"), and Marino was to bill for the loam and be paid by the Big Dig.  See id. at ¶ 16.  Marino would then share the profits with the other participants in the scheme. CW-1 was to supply the purported inside man at the Massachusetts Highway Department (the UC) to insure that Marino got the loam contract and to make sure that the loam was not subject to inspection.  According to the government,"DiNunzio, because of his reputation as a high level member of the [New England La Cosa Nostra], brought to the loam deal the threat of force and financial credibility."  Id.

-6-

By October 2006, there was some indication that Marino might back out of the arrangement since he was concerned that it was too risky because the participants wanted to shortchange the Big Dig a noticeable amount per truckload.  On October 9, 2006, DiNunzio, CW-1 and the UC met to discuss their concerns.  In this conversation, which was recorded, the UC (the alleged highway department employee) expressed concern that Marino would back out, and stated he needed "a guarantee that somebody's got their foot on Marino's neck."  See Ex. 3.  DiNunzio expressed his annoyance with Marino as well, but indicated that things were back on track.  He told the UC that his reaction when learning about Marino's change of heart was that he "was gonna throw this fucking kid [Marino] off a roof" for messing up the deal and costing everyone money.  Id.  DiNunzio further stated that Marino should be called the next day and told to "start banging the fucking thing out."  Id.  DiNunzio said that he, himself, was "the guarantee" that Marino would come through, and when the UC said that he did not know DiNunzio, DiNunzio said, "I'm the Cheeseman" and the UC should "ask anybody about [him]."  Id.  DiNunzio also assured the UC that Marino would pay all of them otherwise it "ain't gonna be safe nowhere" for him, and "somebody's gonna get hurt. Bad."  Id.

As described in more detail infra, DiNunzio was arrested in December 2006 on state charges of extortion, organizing and promoting an illegal gaming operation, and conspiracy to violate the gaming laws.  See Ex. 8.  These charges arose out of activities which had allegedly taken place five years earlier, between September and

Case 1:08-cr-10094-WGY   Document 16   Filed 05/20/08   Page 8 of 20

December 4, 2001.  <u>See</u> Ex. B.  The defendant was released upon posting $20,000.00 bail.

The loam deal was never consummated.  There is some evidence that DiNunzio tried to get his money back from the UC but was unsuccessful.[1]  No violence has been perpetrated against the UC, Marino or the CW-1 to date, nor is there any evidence that they have been threatened.

DiNunzio was arrested on May 5, 2008, in connection with the instant charges.  During his booking, it appears that DiNunzio learned that the UC was an FBI Agent.  <u>See</u> Ex. 4.  It is unclear when DiNunzio learned that CW-1 was working with the FBI, but the court assumes that it was around the same time.

## B.  <u>History And Characteristics Of The Defendant</u>

The defendant, age 50, was born in Boston, Massachusetts.  He graduated High School in Boston.  The defendant is single and has no children.  He has lived in Massachusetts his entire life, except from 1979 until 1990 when he resided in Los Angeles, California.  The defendant lives in East Boston in a building owned by his sister.  His mother lives on the second floor of the building.  The defendant owns and operates the Fresh Cheese Store in the North End.  All of the defendant's extended family resides in Massachusetts.

---

[1]   During argument, DiNunzio's counsel contended that DiNunzio was taunted with the fact that the UC hadn't returned his money, but did not do anything about it.  However, there is no evidence in the record that anyone taunted, ridiculed or egged DiNunzio on because the money was not returned.

According to his doctor, the defendant is morbidly obese and weighs over 400 pounds.  His weight complicates his existing medical conditions, which include diabetes, coronary artery disease and obstructive sleep apnea with pulmonary hypertension.  The defendant concedes that his medical conditions are presently being appropriately treated at Plymouth Correctional Facility, and he is not seeking release due to his medical status.  His counsel does note, however, that the defendant undergoes extensive monitoring and follow-up visits with numerous medical specialists when not incarcerated, and that his medical condition could worsen.  <u>See</u> Ex. A.

For purposes of the instant detention decision, there is sufficient evidence for the court to accept the government's description of DiNunzio as the underboss of the New England Family of La Cosa Nostra ("LCN") since 2004.[2]  Nevertheless, as detailed below, the government has not presented any specific facts establishing the threat allegedly posed by this defendant to witnesses in this case or to others.  Rather, the government is relying on a few scant generalized reputation allegations.  These allegations, whether they are based on fact or not, are insufficient to meet the government's burden either as to the alleged threat posed by this defendant, or of showing that no conditions can be set to reasonably assure the safety of witnesses or the community.

Thus, the government describes the structure of LCN in relevant part as follows:

> La Cosa Nostra ("LCN"), also known as the "Mafia," ... is a
> secretive criminal organization which operates throughout the

---

[2]   This evidence is found in Special Agent Kelly's Affidavit as well as in various recorded phone calls.

United States and the world.  The LCN has a rigid hierarchical structure and its own system of laws.  The LCN is composed of Families, each of which controls a designated geographical area. Each Family is headed by a Boss who has absolute authority within his Family.  A "Consigliere" or counselor acts as the advisor to the Family.  The Underboss, who is the second in command, assists the Boss in running the Family and acts for him in his absence. Below the Underboss are a number of "Capos" or Captains who supervise the illegal activities of members and associates within their "Regime" or Crew.  Individuals become LCN members by participating in the secret initiation ceremony of the LCN (after having served an apprenticeship in crime), through which they the[n] become "Soldiers" or "made" (formally inducted) members, and who are assigned to the Regime of a Capo Regime.  In addition, the Family makes use of "associates" who, although not formally members of the LCN, perform necessary and helpful roles in the Family's criminal activities.

Ex. 1 at ¶ 8.  Luigi "Louie" Manocchio is allegedly the Boss of the New England LCN.

Id. at ¶ 10.  The government has submitted the following generalized descriptions of

the alleged activities of the LCN in support of its contention that this defendant is likely

to obstruct justice and poses a substantial risk of harm.

The business of the New England LCN Family is the earning and maintaining of money and other things of value through illegal activities, including without limitation extortion, gambling, loansharking, and money laundering.  Family members rely on their reputations for violence and murder as implicit and explicit means to advance the Family's criminal objectives and to protect its members from law enforcement investigation and prosecution for the crimes they have committed on behalf of the Family. Members of the New England LCN Family have historically engaged in a regular and systemic pattern of obstruction of justice, intimidation of witnesses, and jury tampering to protect the Family and its members.  The Family has also facilitated and financed Family members who have taken flight to avoid apprehension and prosecution.  The international span of the LCN along with the life loyalty pledges of its members creates a global support network for LCN members, associates, and their family members.

> On October 29, 1989, law enforcement intercepted and recorded a
> LCN induction ceremony in Medford, Massachusetts, evidencing
> the life-long blood loyalty oaths of "omerta" pledged by every LCN
> member.  With their oaths, LCN members effectually vow to their
> fellow LCN members that membership in the LCN Family
> supersedes all other personal relationships, moral codes, and
> obligations imposed by law or otherwise.  LCN inductees explicitly
> pledge to kill, if necessary, members of their own biological families
> in order to protect the LCN Family.  A breach of omerta is
> punishable by death.  After induction, LCN members can identify
> another LCN Family member by referring to him as a "Friend of
> Ours."

Id. at ¶¶ 11-12.  More recently, however, Chief Judge Wolf of this court found that the

New England LCN "has been substantially diminished, if not decimated, and is in

disarray."  U.S. v. Simone, 317 F. Supp. 2d 38, 41 (D. Mass. 2004).  No specific

evidence about the true strength or organization of the LCN has been presented to this

court.

With respect to DiNunzio in particular, his criminal record is as follows.  In 1993,

he pled guilty in federal court in California to extortion and conspiracy using

extortionate means to collect and attempt to collect an extension of credit extortion

charges.  Ex. 1 at ¶ 14.  These charges arose out of activities undertaken by the

defendant and his brother on behalf of the Chicago LCN.  Id. at ¶ 14 n.1.  The

defendant was sentenced to 48 months imprisonment followed by three years of

supervised release.  After serving his sentence, the defendant and his brother returned

to Boston.  Id. at ¶ 14.  The defendant apparently completed his period of supervised

release without incident.

As noted above, in December 2006, DiNunzio was indicted in Essex Superior Court in Massachusetts for extortion, organizing and promoting an illegal gambling operation, and conspiracy to violate the gambling laws arising out of events which took place in 2001. The government points to the state court's decision denying DiNunzio's motion to dismiss that indictment as evidence of the risk DiNunzio poses to the UC and CW-1. See Ex. 8. There was evidence before the Superior Court that the defendant oversaw gambling and protection rackets and was a boss of organized crime in Boston. Such evidence, according to the Superior Court, "allows the inference that the defendant used fear and intimidation as a means of capitalizing on the illegal markets of drug dealing and gambling." Id. There was also evidence that alleged victims were legitimately afraid of crossing the defendant, as failure to comply with his orders might result in serious physical harm. The court analyzed statements made in light of such evidence and concluded that the statements were not innocuous but constituted threats and extortion. Consequently, the court denied the defendant's motion to dismiss the state court indictment. This court notes, however, that even when presented with this evidence of extortion and threats, the state court released the defendant on $20,000 cash bail. Ex. 1 at ¶ 15. The state court charges carry significantly higher potential penalties than the instant case. Nevertheless, based on the evidence before this court, the defendant has made no attempt to flee or otherwise interfere with that case.

### C.  Evaluation of Factors

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755, 107 S. Ct.

2095, 2105, 95 L. Ed. 2d 697 (1987).  After a careful review of the evidence, this court

concludes that the government has not met its burden of proving by clear and

convincing evidence either that there is a serious risk that the defendant will obstruct or

attempt to obstruct justice as defined by § 3142(f)(2)(B) or that there are no conditions

which can be set which will reasonably assure the safety of witnesses or the com-

munity.  See United States v. Ploof, 851 F.2d 7, 12 (1st Cir. 1988) (to warrant detention

court must find that "there is a serious risk defendant will engage or attempt to engage

in the conduct set forth in § 3142(f)(2)(B) *and* that no condition or combination of

conditions set forth in § 3142(c) will *reasonably* assure the safety of any other person

and the community").  The government has also not established by a preponderance of

the evidence that the defendant is likely to flee.  Therefore, the defendant will be

ordered released on the conditions set forth below.

## **Risk of Danger**

This court does not minimize the seriousness of the charges in this case, or the

reputation of the LCN for violence and witness intimidation.  Nor does this court

minimize the government's contention that this defendant exerts substantial control and

power over illegal activities as well as over individuals who would engage in violence if

directed to do so by the defendant.  Admittedly, "membership in the LCN weighs in

favor of detention," but it is not controlling, and it does not "end the inquiry." United

States v. Simone, 317 F. Supp. 2d 38, 41 (D. Mass. 2004).  Over the years, many Mafia

members, including an underboss, have been successfully released pending trial. Id.

at 49, and cases cited.  The facts of this case do not support the government's conten-

tion that DiNunzio is likely to threaten or harm the UC or CW-1, or to cause others to do so on his behalf.

As an initial matter, much of the evidence against DiNunzio is supported by audio and video recordings. Such evidence will not be changed by threatening a witness. Moreover, there is no evidence that DiNunzio took any serious steps to recover the $10,000 he paid to the UC even though the deal did not go through. DiNunzio has had several years to collect the money. While he may not have known that the UC or CW-1 were working with the FBI, he did know that the deal was not being consummated, and that the UC had money that belonged to him. Perhaps the pendency of the Essex County charges caused the defendant to moderate his behavior, or perhaps he never had an intention to use force or threats of force to recover his funds. Nevertheless, the evidence before this court is that the defendant could and did control his behavior and has taken no steps to interfere with these witnesses. Compare United States v. Tortora, 992 F.2d 880, 886 (1st Cir. 1990) (in ordering detention, court finds it "quite significant that Tortora's criminal activities persisted throughout most of his adult life, even while he was on supervised release").

The facts of the crime as presented to the court also do not establish a likelihood of harm being caused the witnesses. The bribery scheme did not involve any elements of force or coercion. While the government emphasizes the recorded conversation between DiNunzio and the UC (Ex. 3), this court does not find that the conversation contained actual threats. In short, this court is not persuaded that DiNunzio's frustration with Marino is evidence that he is likely to obstruct justice. The comments

-14-

about "throwing him off a roof" were not made directly to Marino, nor were they made in
the context of conveying information to be passed on to Marino.  Rather, the comments
seem to be expressions of annoyance rather than actual threats.  Compare id. at 885
(evidence of threats made directly to victim supports finding of danger to community);
United States v. Calvanese, No. 06-30029-MAP, 2007 WL 686727, at *6 (D. Mass.
Mar. 5, 2007) (continued threats and expressions of anger about witness, even
knowing telephone conversations were monitored, indicates conditions of release not
appropriate).

The defendant also appears to recognize that obstruction of justice charges will
make his potential punishment much more severe.  There is no question that govern-
ment agencies will be monitoring the defendant's activities, as well as the well-being of
the witnesses.  As defense counsel stated, it would be foolish for the defendant to
engage in obstructionist activities under the eyes of investigatory agencies.  This is
especially true when the potential sentence the defendant faces on the crime charged,
while not insignificant, is not overwhelming.  Moreover, Agent Kelly testified that he was
not aware of any actions taken by LCN against undercover officers, perhaps in
recognition of the serious repercussions of such actions.

It is also significant that the actions at issue in this case took place several years
ago.  "[T]he fact that the government waited [2] years after the conclusion of its under-
cover operation to seek the indictment of [DiNunzio] indicates that the government did
not previously perceive [DiNunzio] to be so dangerous that his prompt incapacitation
was a priority."  U.S. v. Simone, 317 F. Supp. 2d at 50 (internal citation omitted).

Finally, it is the responsibility of this court to <u>reasonably</u> assure the safety of the witnesses and the community. Incarceration would not result in the total isolation of the defendant. While this court accepts the government's argument that incarceration would limit the defendant's communications with others, and perhaps interfere with his ability to carry on with his day to day business activities, it would not prevent the defendant from simply conveying instructions to others to interfere with the witnesses. Incarceration, in this court's view, simply does not eliminate that risk. On the other hand, the conditions imposed below will significantly limit the defendant's access to others and give the government the right and ability to closely monitor the defendant's communications. While no system is foolproof, the restrictive conditions imposed herein should give the government sufficient monitoring rights to insure compliance with this court's order, and reasonably insure the safety of individuals and the community.

## Risk of Flight

The government does not seriously argue that the defendant is likely to flee, and this court finds that the government has not met its burden of proof on this issue. The defendant's medical condition renders flight unlikely, and there is no evidence before the court that the defendant has significant contacts elsewhere where he would be likely to flee.

## Conditions of Release

The government also has not met its burden of proving that there are no conditions or combinations of conditions which would reasonably assure the safety of

witnesses and the community, or the defendant's appearance as required.  This court

finds that there are conditions, many of which have been imposed in other LCN cases,

which would significantly curtail the defendant's ability to meet and communicate with

others.  These restrictions would, in this court's view, reasonably insure the safety of

witnesses and the community, and render unlikely any risk of flight.

 The defendant has proposed a number of conditions, some of which the court

has accepted and others which the court has rejected.  Several of the proposals

warrant some comment.

 First, the defendant has proposed posting a $200,000 bond secured by $20,000

cash.  This court accepts this proposal because it is of a sufficient amount to cause the

defendant to pause before violating any conditions.  Moreover, while important, the

bond is not a "crucial release condition."  Compare United States v. Patriarca, 948 F.2d

at 795.  Therefore, this court does not require further financial information at this time to

compare the amount of the bond with the defendant's assets.  However, the govern-

ment may propose a different amount if it deems it appropriate.

 The defendant has also proposed that he be allowed to work at his cheese store.

Such unrestricted access to other members of LCN is inappropriate at this time.  Such

unmonitored access, both to and from work and while at work, makes it too risky that

the defendant will engage in unlawful activities.  As the defendant's counsel recognized

at the hearing, at least initially electronic monitoring at the defendant's home 24/7 is

appropriate to insure that his contacts are limited and to reduce the risk of both

obstruction of justice and continued illegal activities.  The defendant may seek to modify this provision after a reasonable period of time, if appropriate.

The defendant will be allowed to attend pre-approved medical and legal appoint-ments.  However, again, the defendant's activities outside the home should be monitored.  For present, the court will order that the defendant be escorted by counsel. However, the court will entertain a proposal for another person to monitor and escort the defendant.

The other conditions, as detailed below, are designed to limit the defendant's access to others and to provide the government information to help insure the defendant's compliance with the orders of this court.

## IV.  CONDITIONS OF RELEASE

IT IS ACCORDINGLY ORDERED that the defendant be released on the following conditions:

1.     The defendant shall post a $200,000 bond secured by $20,000 in cash. This bond is to secure compliance with all conditions of pre-trial release.

2.     The defendant shall maintain his residence at 73 Wadsworth Street, East Boston, Massachusetts (hereinafter the "Custodial Residence").

3.     The defendant shall be placed on electronic monitoring at the Custodial Residence.  Defendant may not travel except for court appearances, to meet with his attorney, to report to Pretrial Services, or to receive medical attention.  Travel is restricted to the Commonwealth of Massachusetts.  Each such trip must be previously approved by Pretrial Services and the defendant must be escorted to such appoint-

ments by counsel or another individual approved by the court.  In a medical emergency, the defendant is to contact Pretrial Services as soon as practicable by telephone and may be transported in such an emergency to the hospital.

4.      Defendant shall execute the standard electronic monitoring agreement with Pretrial Services.  No call forwarding device, caller identification device, answering machine or similar service may be used or installed in connection with the residence telephone.  Only one telephone line shall serve the residence.  The defendant may not use a cell phone.  At the request of Pretrial Services, defendant shall provide his telephone bills and internet provider bills for review.

5.      Defendant shall avoid all contact, whether direct or indirect, in person, through another person, by telephone, e-mail or by any other means of communication, with the undercover officer and confidential witness in this case.

6.      Defendant shall avoid all contact, whether direct or indirect, in person, through another person, by telephone, e-mail or by any other means of communication, with any other potential witness in this case, including all named defendants, unless defendant's attorney of record is physically present.  Also, defendant shall have no direct or indirect contact of any sort with persons whose names appear upon an "Association List" to be prepared by the U.S. Attorney's Office and served upon defendant counsel.  If defendant seeks contact with any person on the "Association List," he shall, through his attorney, first seek approval from the United States Attorney and, in the absence of approval, defendant may apply to this court upon a showing of good cause.

7.      Defendant shall be deemed to consent to random search or inspection of his residence by Pretrial Services and by authorized Special Agents of the FBI and he shall further be deemed to consent to installation of a pen register and/or telephone trap device at the Custodial Residence on the defendant's phone and e-mail at the government's discretion and expense.

8.      Furthermore, the defendant shall:

(a)      report to Pretrial Services as directed;

(b)      refrain from possessing a firearm, destructive device or other dangerous device, and any such device must be removed from the Custodial Residence;

(c)      surrender any passports and may not apply for any passports or travel documents while this matter is pending;

(d)      commit no federal, state or local crime during the period of release; and

(e)      comply with all conditions imposed by the Essex Superior Court in the case presently pending there.

9.      Statutory conditions of release shall apply as well.


   / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge